UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

YVONNE HARJU, *et al.*,

          Plaintiffs,

    v.

JOHNSON & JOHNSON, *et al.*,

          Defendants.

CASE NO. 3:20-cv-06258-BHS-JRC

REPORT AND RECOMMENDATION

NOTED FOR: July 30, 2021

      This matter is brought against Johnson & Johnson ("J&J") and an entity thereof, Ethicon, Inc., by three plaintiffs—two women implanted with defendants' pelvic mesh products and one woman's spouse, who alleges loss of consortium.  The District Court has referred the matter to the undersigned (Dkt. 21), and defendants' motion to dismiss (Dkt. 30) all claims in the operative complaint (Dkt. 29) is now before the Court.

      According to the operative complaint, plaintiff Yvonne Harju was implanted with defendants' Gynecare TVT-Secur ("TVT-S") pelvic mesh product, and plaintiff Doris Hosking was implanted with defendants' Gynecare Prosima ("Prosima") pelvic mesh product.  Both

allegedly suffered serious complications.  Plaintiffs allege that defendants knew that these products had myriad defects and that these defects led to injuries such as those that plaintiffs suffered, yet aggressively marketed the products, without disclosing the relevant defects and risks of complications.  Plaintiffs therefore bring claims under the Washington Products Liability Act ("WPLA," ch. 7.72 RCW), for fraud, for violation of the Washington Consumer Protection Act ("WCPA," ch. 19.86 RCW), for unjust enrichment, and for loss of consortium.

Defendants seek dismissal of all claims.  The Court agrees with some of defendants' arguments.  Specifically, the Court agrees that plaintiffs have failed to plausibly plead that they were third-party beneficiaries of the relationship between their providers and defendants—which is necessary to support plaintiffs' breach of implied warranty claim.  And plaintiffs have failed to plausibly plead that they had a "special relationship" with defendants, which is necessary to support plaintiffs' claims for fraudulent concealment and constructive fraud.  Further, the WPLA preempts the unjust enrichment claim.  However, plaintiffs have adequately alleged that the mesh products had design and manufacturing defects and that defendants breached express warranties and failed to warn plaintiffs of the dangers of the implant products.  And plaintiffs have otherwise pleaded fraud-based claims with the necessary particularity under Federal Rule of Civil Procedure 9(b) and adequately pleaded a loss of consortium claim on behalf of Ms. Hosking's spouse.

Therefore, the motion to dismiss (Dkt. 30) should be granted in part and denied in part. Plaintiffs' claims for constructive fraud, fraudulent inducement, and breach of the implied warranty of merchantability should be dismissed with leave to amend, and plaintiffs' unjust enrichment claim should be dismissed without leave to amend.

# BACKGROUND

Plaintiffs, who are Washington State citizens, brought suit in this Court in December 2020, relying on the Court's diversity jurisdiction. Dkt. 1, at 1–2. They allege that J&J is a New Jersey corporation and that the "Ethicon Franchise," including defendant Ethicon, is a business unit within J&J that develops and sells the pelvic floor repair products at issue in this case. Dkt. 29, at 3. Plaintiffs also allege that Ethicon is a New Jersey citizen and that J&J and Ethicon can essentially be considered as a single entity for purposes of this action. Dkt. 29, at 4.

Plaintiffs claim that defendants' TVT-S and Prosima pelvic mesh products have a number of flaws, including that they contain polypropylene mesh, which scientific evidence has shown to be "biologically incompatible with human tissue and [which] promotes an immune response in a large subset of the population receiving" these products. Dkt. 29, at 7–8. In addition, plaintiffs allege that these products contain collagen, causing a hyper-inflammatory response leading to problems including chronic pain and fibrotic reaction. Dkt. 29, at 9. Plaintiffs also allege a laundry list of other defects with these products, including a propensity for mesh shrinkage and degradation and the inability to safely remove the products after a complication occurs. *E.g.*, Dkt. 29, at 25–26. According to plaintiffs, defendants knew of these issues, yet omitted or misrepresented information about the implant products' safety throughout the relevant time period. Dkt. 29, at 8–9.

According to plaintiffs, the FDA approved both products' use no later than 2002, under an abbreviated process that allows for approval without a formal safety or efficacy review. Dkt. 29, at 9–10. Until defendants withdrew the TVT-S and Prosima products and the FDA banned them, defendants "aggressively" marketed these products as minimally invasive surgical techniques for the treatment of conditions including stress urinary incontinence and pelvic organ

1  prolapse.  Dkt. 29, at 10–11.

2      Plaintiffs assert that the FDA began to note issues with the products in 2008, including a

3  public health notification describing over 1,000 complaints in a three-year period.  Dkt. 29, at 11.

4  Then, in July 2011, the FDA issued a safety communication related to products including the

5  TVT-S and Prosima products regarding associated serious complications that were "not rare."

6  Dkt. 29, at 12 (internal quotation marks removed).  The FDA also noted that scientific literature

7  demonstrated that pelvic organ prolapse repair with mesh led to complications.  *See* Dkt. 29, at

8  13.  In 2011, various consumer and medical groups also raised concerns about the use of pelvic

9  mesh products, including the TVT-S and Prosima products.  Dkt. 29, at 13–14.

10      In September 2011, according to plaintiffs, the FDA acknowledged the need for

11  additional data regarding the use of pelvic mesh products for stress urinary incontinence, and, in

12  January 2012, the FDA mandated further study of the risks of pelvic mesh products.  Dkt. 29, at

13  14–15.  In 2016, the FDA reclassified Prosima and other pelvic organ prolapse products as "high

14  risk," and in 2019, the FDA ordered manufacturers to stop selling such devices.  Dkt. 29, at 15.

15      Plaintiffs allege that defendants "knew or should have known" about the risks identified

16  in the safety communication and by medical groups during the entire time that defendants

17  marketed the products at issue.  Dkt. 29, at 15–16.  Plaintiffs also allege that defendants knew or

18  should have known about issues with predicate products for the pelvic mesh products at issue.

19  *See* Dkt. 29, at 16–17.  Plaintiffs allege that defendants did not perform adequate testing and

20  research and that when they learned of serious problems with the products through clinical trials

21  and reports, they failed to disclose those issues.  *E.g.*, Dkt. 29, at 21.

22      Ms. Harju alleges that a doctor in Longview, Washington, implanted Ms. Harju with the

23  TVT-S pelvic mesh product on October 20, 2008, in order to alleviate her stress urinary

24

1   incontinence.  Dkt. 29, at 1–2.  She alleges that she subsequently developed complications from

2   the TVT-S pelvic mesh product and suffered injuries caused by mesh deficiencies, leading to an

3   attempted mesh removal procedure on May 11, 2016.  Dkt. 29, at 2.

4       Ms. Hosking alleges that an Edmonds, Washington, doctor implanted her with the

5   Prosima pelvic mesh product on April 21, 2010, in order to alleviate her pelvic organ prolapse.

6   Dkt. 29, at 2.  Ms. Hosking alleges that she, too, subsequently developed complications from her

7   pelvic mesh product and suffered injuries cause by mesh deficiencies, leading to a mesh

8   takedown procedure.  Dkt. 29, at 2–3.

9       Plaintiffs now bring suit for design defect, manufacturing defect, failure to warn, and

10  breach of express and implied warranties under the WPLA.  They also bring suit for common

11  law fraud, fraudulent concealment, constructive fraud, violation of the WCPA, unjust

12  enrichment, and loss of consortium, and they seek punitive and other damages.

13      The parties have also informed the Court that from 2012 to 2018, there was multidistrict

14  litigation concerning claims of plaintiffs allegedly injured by defendants' pelvic mesh devices for

15  stress urinary incontinence and pelvic organ prolapse.  *See* Dkt. 33, at 1–2.  The parties assert

16  that extensive discovery has already occurred in the multidistrict litigation regarding pelvic mesh

17  products including those at issue herein.  Dkt. 33, at 2.

18      Defendants have filed a motion to dismiss all claims in the operative complaint, and the

19  matter is ripe for review.  Dkt. 30.

20                          **DISCUSSION**

21  **I. Legal Principles**

22      A complaint must contain a "short and plain statement of the claim showing that the

23  pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A motion to dismiss under Rule 12(b)(6) of

24

1   the Federal Rules of Civil Procedure can be granted only if the complaint, with all factual

2   allegations accepted as true, fails to "raise a right to relief above the speculative level." *Bell*

3   *Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Mere conclusory statements in a

4   complaint and "formulaic recitation[s] of the elements of a cause of action" are not sufficient.

5   *Id.*; *Chavez v. United States*, 683 F.3d 1102, 1108-09 (9th Cir. 2012). "Dismissal can be based

6   on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

7   cognizable legal theory." *Ballistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir. 1990).

8
         To survive a motion to dismiss, a complaint must contain sufficient factual matter,
         accepted as true, to "state a claim to relief that is plausible on its face." A claim has
9        facial plausibility when the plaintiff pleads factual content that allows the court to
         draw the reasonable inference that the defendant is liable for the misconduct
10       alleged. The plausibility standard is not akin to a probability requirement, but it
         asks for more than a sheer possibility that a defendant has acted unlawfully.
11

12   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556, 570). The

13   pleading must be more than an "unadorned, the-defendant-unlawfully-harmed-me accusation."

14   *Id.* While the Court must accept all the allegations contained in the Complaint as true, the Court

15   does not have to accept a "legal conclusion couched as a factual allegation." *Id.*

16   **II. WPLA Claims**

17       Plaintiffs bring five claims under the WPLA, which is generally the exclusive remedy for

18   product liability claims in Washington State. *See Bylsma v. Burger King Corp.*, 176 Wn.2d 555,

19   559 (2013); *Macias v. Saberhagen Holdings, Inc.*, 175 Wn.2d 402, 409 (2012).

20       **A. Defective Design**

21       First, plaintiffs assert that "some or all" of a list of issues with the TST-V and Prosima

22   devices rendered these products' designs defective. Dkt. 29, at 38–39. Defendants raise several

23

24

1    arguments that plaintiffs have failed to plausibly plead causation or a defect, so that this claim

2    should be dismissed.  Dkt. 30, at 4.  The Court disagrees with defendants.

3           "The elements of proof for a design defect products liability claim require a showing of

4    (1) a manufacturer's product (2) not reasonably safe as designed (3) causing harm to the

5    plaintiff."  *Pagnotta v. Beall Trailers*, 99 Wn. App. 28, 36 (2000); *see also* RCW

6    7.72.030(1) ("A product manufacturer is subject to liability to a claimant if the claimant's harm

7    was proximately caused by the negligence of the manufacturer in that the product was not

8    reasonably safe as designed or not reasonably safe because adequate warnings or instructions

9    were not provided.").

10           Defendants argue that plaintiffs fail to allege how the products were flawed because they

11    do not explain "how the design of the products gave them any such propensity" for

12    complications.  Dkt. 30, at 5.  To the contrary, the operative complaint includes an extensive and

13    detailed list of alleged defects, which the Court summarizes as follows: (1) the use of

14    polypropylene "and/or" collagen material, which causes an immune reaction; (2) the insertion

15    and placement of the products, including the use and design of arms and anchors; (3) the

16    products' propensity for shrinkage, elongation, or deformation; (4) the products' inelasticity; (5)

17    their propensity for fragmentation or other degradation over time; (6) causation of collagen-

18    related infection and harshness on female pelvic tissue; and (7) creation of a non-anatomic

19    condition when implanted following instructions.  Dkt. 29, at 36–38.  Separately in the

20    complaint, plaintiffs also allege that scientific evidence shows that polypropylene mesh causes

21    problems in "a large subset of the population" who receive the implants because it degrades and

22    promotes a severe foreign body reaction and chronic inflammatory response (Dkt. 29, at 7–8)

23    and because if the implants contain collagen, the disintegration of collagen causes adverse tissue

24

1  reactions and infections.  Dkt. 29, at 9.   Indeed, plaintiffs allege that the FDA has specifically

2  warned that the polypropylene mesh used in the implants has a risk of mesh contraction causing

3  various symptoms and has noted that the mesh implants cause mesh-related complications not

4  experienced by patients who undergo surgery without mesh.  Dkt. 29, at 12–13.  Plaintiffs have

5  adequately alleged that due to one or more of these flaws, TVT-S and Prosima products are not

6  reasonably safe as designed.

7         Defendants also take issue with plaintiffs' allegations that collagen caused issues with the

8  products, but their claim that the products do not contain collagen is not an appropriate issue for

9  resolution on a motion to dismiss, as it relies on matters outside the face of the complaint.  *See*

10  Dkt. 30, at 5.  Finally, defendants argue that plaintiffs have failed to allege a plausible connection

11  between their injuries and the alleged defects, rather than an injury consistent with any surgery

12  for treatment of prolapse or stress incontinence.  Dkt. 30, at 5.

13         The Court agrees with the analysis of the Honorable Robert J. Bryan in another WPLA

14  case brought in this Court that requiring overly detailed factual allegations at this stage is

15  unreasonable.  In that case, Judge Bryan concluded that defendants' argument "that Plaintiffs

16  should be forced to provide more factual allegations as to their WPLA claim and more

17  specifically identify their theory—unsafe design, inadequate warnings, manufacturing defects, or

18  noncompliance with express or implied warranties" was not well taken:

19        Plaintiffs properly point out that whether a product's defect was due to its design
          or manufacture is the sort of information that is gained in discovery.  To force
20        Plaintiffs to plead facts in support of the theory would shut the courthouse doors
          before Plaintiffs had an opportunity to meaningfully engage in the process.  This
21        reaches well beyond the Supreme Court's holdings in *Twombly* and *Iqbal.*

22  *Braden v. Tornier, Inc.*, No. C09-5529RJB, 2009 WL 3188075, at *3 (W.D. Wash. Sept. 30,

23  2009).  The Court agrees that as a general matter, requiring extremely detailed allegations such

24

as which of many potential design defects caused a particular complication or that plaintiffs

isolate one theory of defective design, or manufacturing, or inadequate warning is simply

unreasonable at this early stage.

Here, plaintiffs have adequately pleaded that one or more of the alleged design defects

caused their injuries. Defendants' arguments that the implantation surgeries (not the products

themselves) caused the damages at issue rest on allegations outside the fact of the complaint,

require additional factual analysis, and are not appropriate reasons to grant a motion to dismiss.

Defendants cite to orders from the Eastern District of Washington dismissing allegations

of design defect because of failure to plausibly allege causation. *See Hernandez v. Johnson &*

*Johnson*, No. 4:20-CV-05136-SMJ, 2021 WL 320612, at *3 (E.D. Wash. Jan. 8, 2021); *see also*

Dkt. 34, *Woodcock v. Ethicon, Inc., et al.*, 1:20-cv-03100-SMJ (E.D. Wash. April 15, 2021)

(briefly referring to *Hernandez* as the basis for dismissal); Dkt. 25, *Butler et al. v. Ethicon, Inc.,*

*et al.*, 4:20-cv-05137-SMJ (E.D. Wash. March 25, 2021) (same). In *Hernandez*, the plaintiff

alleged that she had to undergo a revision surgery because her mesh implant product eroded and

became exposed, causing pelvic and abdominal pain. *Id.* at *1. The District Court concluded

that plaintiff plausibly alleged that the product was not reasonably safe as designed but failed to

plausibly allege that it was the device's design that caused her damages. *Id.* at *3.

Here, however, plaintiffs specifically allege a list of design defects (summarized above)

and that Ms. Harju's and Ms. Hosking's implants exhibited some or all of these defects. Dkt. 29,

at 36–40. They also plausibly allege that the defects caused their injuries. For instance,

plaintiffs allege that Ms. Harju and Ms. Hosking suffered from complications including pelvic

pain and urinary dysfunction after implantation, which they allege are examples of symptoms

caused by the use of polypropylene and other surgical polymers when used for pelvic floor

1    repair. *See* Dkt. 29, at 2–3, 8. This distinguishes the matter from *Hernandez* and from the

2    allegations deemed inadequate in *Dolan v. Bos. Sci. Corp.*, No. 20-CV-1827 (NEB/LIB), 2021

3    WL 698777, at *2 (D. Minn. Feb. 23, 2021), where plaintiff failed to provide a link between the

4    alleged design defect and the plaintiff's injuries. The Court is not otherwise persuaded by

5    defendants' citations to various other nonbinding authorities. Each case must stand or fall on its

6    own facts. There may be other cases that involve similar facts, but those cases are not this case.

7    Plaintiffs have alleged sufficient facts to bring a claim. It will be up to plaintiffs to prove those

8    facts, but the case should not be dismissed on the assumption that they cannot.

9         Nor are plaintiffs' allegations rendered implausible by setting forth various alternative

10   potential theories of their injuries, at this early stage in the proceedings. *Compare Monroe v.*

11   *Medtronic, Inc.*, No. CV 20-10144-NMG, 2021 WL 66294, at *3 (D. Mass. Jan. 6, 2021)

12   ("[P]laintiff's burden on a motion to dismiss does not require her to provide such a connection

13   [precisely how the alleged defect caused her injuries] conclusively. . . . Rather, it is sufficient

14   that [plaintiff] has alleged that the . . . mesh was defective and proffered facts to support a

15   reasonable inference that the defect caused her injuries."). The Court disagrees with defendants'

16   nonbinding authority that a plaintiff cannot state a plausible design defect claim without

17   explaining "which of the enumerated design defects . . . caused her injury, whether she was pain-

18   free before the implantation . . . , what outcome [she] anticipated, or what other factors may have

19   contributed to [her] injuries." *Dolan*, 2021 WL 698777, at *2.

20        Plaintiffs have adequately alleged that the design defects caused their injuries. Their

21   allegations suffice to give fair notice to defendants of the basis for their design defect claims.

22   The District Court should not dismiss the design defect claim.

23   ///

24

1

**B.  Manufacturing Defect**

2       Plaintiffs also allege a manufacturing defect claim.  Dkt. 29, at 40.  Specifically, they

3   allege that during manufacture, defendants used non-medical grade polypropylene and used

4   techniques that created sharp edges on the products, leading the products to degrade and suffer

5   other defects.  Dkt. 29, at 40–41.   Defendants argue that plaintiffs have failed to plausibly allege

6   a manufacturing, rather than design, defect related to this claim.  Dkt. 30, at 8.

7       Under the WPLA, "[a] design defect is a defect that is present across an entire product

8   line when some aspect of the product is unsafe, while a manufacturing defect is due to factory

9   departure from proper specifications."  *Moore v. Harley-Davidson Motor Co. Grp.*, 158 Wn.

10  App. 407, 425 (2010).

11      Here, contrary to defendants' arguments, it is a reasonable inference from the complaint

12  that it was a departure from proper specifications for defendants to use non-medical grade

13  materials or manufacturing techniques that resulted in sharp product edges.  Defendants argue

14  that the use of laser or mechanical-cutting techniques is not a deviation from the intended design,

15  but this argument, again, rests on facts outside the allegations of the operative complaint.  Dkt.

16  34, at 6.  Nor is the Court persuaded by defendants' string citation of nonbinding authorities.

17  Dkt. 30, at 8 n.4

18      The District Court should not dismiss plaintiffs' manufacturing defect claim.

19      **C.  Failure to Warn**

20      Plaintiffs bring a claim for failure to warn on the basis that defendants did not provide

21  adequate warnings about the dangers of the products.  *See* Dkt. 29, at 42.  Defendants argue that

22  plaintiffs have failed to allege facts that plausibly show that the warnings were inadequate, what

23

24

1    warnings should have been provided instead, or how the failure to warn caused plaintiffs'

2    injuries.  Dkt. 30, at 9.

3         Under the WPLA,

4    [a] product is not reasonably safe because adequate warnings or instructions were
     not provided with the product, if, at the time of manufacture, the likelihood that the
5    product would cause the claimant's harm or similar harms, and the seriousness of
     those harms, rendered the warnings or instructions of the manufacturer inadequate
6    and the manufacturer could have provided the warnings or instructions which the
     claimant alleges would have been adequate.

7

8    RCW 7.72.030(1)(b).  "To prevail on a failure to warn claim, a plaintiff must show that (1) the

9    defendant failed to sufficiently warn, (2) the plaintiff suffered damages, and (3) the defendant's

10   failure to sufficiently warn of the dangers was a proximate cause of the plaintiff's

11   damages."  *Breen v. Ethicon, Inc.*, No. C20-5595 BHS, 2021 WL 673485, at *5 (W.D. Wash.

12   Feb. 22, 2021) (citing *Little v. PPG Industries, Inc.*, 19 Wn. App. 812, 818 n.3 (1978)).

13        Defendants again rely on *Hernandez* (which is not binding on this Court), this time as the

14   basis to argue a lack of plausible allegations that the warnings were inadequate, the content of

15   proposed warnings, or causation.  In that case, the District Court found that the plaintiff had

16   failed to adequately plead that any failure to warn proximately caused her injuries, including the

17   eventual need for additional surgery, and that plaintiff had failed to adequately allege that the

18   Mesh Product was not safe because of a failure to warn.  2021 WL 320612, at *4.

19        Here, however, plaintiffs allege that defendants knew of and failed to warn plaintiffs or

20   their providers regarding an extensive list of defects, which the Court summarizes as follows:

21   the products' propensities to shrink and degrade; the products' inelasticity; the frequency and

22   manner of mesh erosion or extrusion; the risk of inflammation, chronic infections, scarring, new

23   urinary dysfunction, dyspareunia, painful sexual relations, recurrent pain, and revision surgery;

24

1   the fact that treatment of plaintiffs' conditions with these products was no more effective than

2   using other, safer means, and would result in making future surgical repairs more difficult and

3   more likely; and that complete removal of the products might not be possible.  *See* Dkt. 29, at

4   43–44.  Plaintiffs further allege that warnings and instructions for use were inadequate because

5   the warnings did not reference these defective propensities, risks, and contraindications and that

6   had plaintiffs been so warned of these propensities, risks, and contraindications, they would not

7   have consented to surgical implantation of the products.  Dkt. 29, at 44–46.  In addition,

8   plaintiffs allege that their implanting physicians relied in part on the defective instructions for

9   use and other materials provided by defendants before implanting the products in plaintiffs.  Dkt.

10  29, at 46; *see also* Dkt. 29, at 19 (Defendants intentionally misrepresented, concealed and/or

11  failed to disclose the true defective nature of the . . . products so that Plaintiffs and their

12  implanting physicians would request and purchase the . . . products[.]").

13          As referenced above, plaintiffs have also pleaded, among other things, that they suffered

14  from complications including those that they allege are the type that result from the

15  manufacturing defects.  *See* Dkt. 29, at 2–3, 8.  In addition, both plaintiffs allege that they were

16  unable to successfully have the products removed.  *See* Dkt. 29, at 2.  They also otherwise allege

17  that they suffer from defects that defendants should have warned of, including, for instance

18  pelvic pain, mesh migration, mesh shrinkage or contracture, and infections.  *See* Dkt. 29, at 3.

19          Contrary to defendants' claims, plaintiffs have adequately alleged how the failures to

20  warn caused their injuries, that the warnings were inadequate, and how the implanting surgeons

21  relied on defendants' inadequate warnings.  *See* Dkt. 30, at 9–10.  And plaintiffs have alleged the

22  above-noted lengthy list of warnings that should have been included.  *Hernandez* is not on point,

23

24

1  and the Court is not persuaded by defendants' string cite of nonbinding authority.  Dkt. 30, at 10,

2  n.5.

3        The District Court should not dismiss the failure to warn claim.

4        **D.  Express Warranty**

5        Plaintiffs allege that defendants warranted that the TVT-S and Prosima products would

6  permanently cure or alleviate their stress urinary incontinence and pelvic organ prolapse and

7  would not need to be partially removed.  Dkt. 29, at 48.  Plaintiffs therefore bring a breach of

8  express warranty claim against defendants.  *See* Dkt. 29, at 48.  Defendants seek dismissal of the

9  express warranty claims.  Dkt. 30, at 10–11.

10       The WPLA provides for strict liability if a "claimant's harm was proximately caused by

11  the fact that the product was . . . not reasonably safe because it did not conform to the

12  manufacturer's express warranty."  RCW 7.72.030(2).  Washington law defines an express

13  warranty as "any affirmation of fact or promise."  RCW § 62A.2–313(a).  To state a claim for

14  breach of express warranty under the WPLA, plaintiffs must show that (1) the warranty was

15  made part of the basis of the bargain; (2) the warranty relates to a material fact concerning the

16  product; and (3) the warranty turns out to be untrue.  RCW 7.72.030(2)(b).

17       First, defendants argue that the contents of Instructions for Use cannot form the basis for

18  an express warranty claim.  *See* Dkt. 30, at 12–13.  They request dismissal of that portion of the

19  express warranty claim founded on the allegations that the Instructions for Use included express

20  warranties that the products might cause "transient" local wound irritation, a "minimal

21  inflammatory reaction," and were "not subject to degradation or weakening by the action of

22  tissue enzymes."  *See* Dkt. 29, at 49.

23

24

1       Defendants rely on *Bryant v. Wyeth*, 879 F. Supp. 2d 1214, 1226 (W.D. Wash. 2012), a

2   case decided on summary judgment and in which the plaintiff appeared to argue that product

3   labeling constituted an express warranty that a drug was safe for use by women suffering from

4   menopause, but the drug was more dangerous and detrimental than warranted.  The Court

5   examined the precise product label at issue and concluded that it provided general statistical

6   information about the risk of breast cancer from the drug, but not a promise or factual

7   representation about the drug's safety.  *Id.* at 1227.  But here, the Court is not asked to examine

8   the statement in context to determine whether it amounted to an express warranty—rather,

9   plaintiffs have alleged that they were told, among other things, that the products were not subject

10  to degradation or weakening, when in fact they were.  The Court must take this allegation of an

11  express warranty as true when ruling on a motion to dismiss.

12      Defendants' reliance on rulings in courts not applying Washington State law and holding

13  that various statements on warning labels were not express warranties is not persuasive.  *See* Dkt.

14  30, at 13.  The Court has not identified any Washington State authority tending to support the

15  proposition that, as a general matter, if the Instructions for Use included a statement that, for

16  instance, the products "are not subject to degradation or weakening by the action of tissue

17  enzymes" (Dkt. 29, at 49), that could not form the basis for an express warranty claim.  Rather,

18  the crux of the matter would be whether the Instructions for Use in fact contain such a claim and

19  whether the context was such that it created an express warranty—issues not before the Court at

20  this time.  *See Fed. Signal Corp. v. Safety Factors, Inc.*, 125 Wn. 2d 413, 424-25 (1994) (setting

21  forth factors a court can consider to determine whether an express warranty was made, including

22  specificity of the statement, whether the statement related to the quality of the good, the buyer's

23  actual or imputed knowledge of the true conditions of the good, and the nature of the defect).

24

1        Defendants next argue that claims based on defendants' marketing materials and

2  advertisements creating an express warranty should be dismissed because plaintiffs fail to

3  identify any specific promise or affirmation of fact made in the marketing materials and upon

4  which plaintiffs relied.  Dkt. 30, at 13.  They again rely on *Hernandez*, in which the District

5  Court briefly noted that an assertion that a device "did not conform to an express warranty made

6  by Defendants" but that failed to state the contents of the warranty or how the defendants

7  breached the warranty was inadequate.  2021 WL 320612, at *5.

8        Here, in contrast, plaintiffs allege that defendants made express warranties including,

9  among other things, that the products were "safe and effective" and "safer and more effective

10  tha[n] other alternative procedures and devices" on the market and that they would not degrade

11  or weaken.  Dkt. 29, at 49.  Unlike in *Hernandez*, plaintiffs have provided the affirmations that

12  they contend are express warranties in the marketing and advertising materials.

13        In addition, defendants argue that plaintiffs have failed to provide any facts to support

14  that the alleged warranty was part of the basis of the bargain or that plaintiffs relied on the

15  alleged warranty.  Dkt. 30, at 13–14.  Again, however, plaintiffs allege that they "and/or" their

16  healthcare providers chose these products based specifically on the express warranties alleged by

17  plaintiffs.  Dkt. 29, at 50.

18        Plaintiffs have gone beyond merely conclusory statements and have alleged that

19  defendants made specific statements in the Instructions for Use and marketing and advertising

20  materials that they and their doctors relied on when choosing defendants' products.  This is

21  enough to plead an express warranty claim under the WPLA.  The District Court should decline

22  to dismiss the express warranty claims.

23  ///

24

1

**E.  Implied Warranty**

2       Plaintiffs bring a claim for breach of the implied warranty of merchantability on the basis

3  that the TVT-S and Prosima products implanted in plaintiffs Harju and Hosking were neither

4  merchantable nor suited for their intended use as warranted.  Dkt. 29, at 53.  Defendants argue

5  that this claim should be dismissed because plaintiffs have not plausibly alleged that they were in

6  privity of contract with defendants.  Dkt. 30, at 14.  The Court agrees with defendants.

7       "Generally, contractual privity between the buyer and seller must exist before a plaintiff

8  may maintain an action for a breach of warranty."  *Thongchoom v. Graco Children's Prod., Inc.*,

9  117 Wn. App. 299, 307 (2003).  Washington courts apply the "sum of the interaction" test to

10  determine whether a manufacturer was sufficiently involved in a transaction (including post-sale)

11  with a remote purchaser to warrant enforcement of an implied warranty.  *See, e.g.*, *Touchet*

12  *Valley Grain Growers, Inc. v. Opp & Siebold General Constr. Inc.*, 119 Wn.2d 334, 345–47

13  (1992).

14       In *Kadiak Fisheries Co. v. Murphy Diesel Co.*, 70 Wn.2d 153, 155 (1967), for instance,

15  the Washington Supreme Court analyzed the sum of the interaction and found that a fishing

16  company was the third-party beneficiary of a contract between an engine manufacturer and its

17  sales agent for an engine specially constructed for the fishing company's boat.  The manufacturer

18  knew the particular specifications for the engine needed by the fishing company, shipped the

19  motor directly to the fishing company, sometimes communicated directly with the fishing

20  company and visited the boat in question, and dispatched service people and parts to the fishing

21  company.  *Id.* at 164–65.

22       Applying *Kadiak*, the *Touchet Valley* court found that the owner of a collapsed grain

23  storage facility was the intended third-party beneficiary of the contract between a general

24

contractor and subcontractor to build a grain storage building. 119 Wn.2d at 337–38. The subcontractor knew the owner was the customer, its purpose, and its requirements for the building, including that the specifications were the owner's, and the subcontractor delivered the components to the owner's site and joined in the attempt to repair the building. *Id.* at 346–47.

Finally, in *Urban Development, Inc. v. Evergreen Building Products, LLC*, 114 Wn. App. 639, 647–48 (2002)*, as amended* (Jan. 17, 2003), Division One of the Washington State Court of Appeals applied *Kadiak* and *Touchet Valley*, concluding that a general contractor was not the intended beneficiary of a contract between siding suppliers and a plastering subcontractor. The general contractor had no interactions with the siding suppliers, and they did not design the siding system specifically to the general subcontractor's requirements. *Id.* at 648.

Applying these authorities to the allegations of the operative complaint, plaintiffs' relationship with defendants related to the purchase of the pelvic mesh products is more like the general subcontractor's relationship with the siding suppliers in *Urban Development, Inc.*, than the relationships in *Kadiak* and *Touchet Valley*. Plaintiffs do not allege that defendants knew of them, in particular, or that the products were designed to their particular specifications. Nor do they claim that the products were delivered to them, rather than the hospitals or doctors who directly purchased the pelvic mesh products (*see* Dkt. 29, at 19, 52), or that defendants joined in the attempts to alleviate their symptoms or dispatched anyone to assist. In short, plaintiffs fail to provide plausible factual allegations to support their legal conclusion that they were intended third-party beneficiaries of the contract between implanting physicians or hospitals and defendants.

1    However, it is possible that plaintiff may be able to allege facts that could render this

2    claim viable.  Therefore, the implied warranty claims should be dismissed, but the District Court

3    should grant leave to amend.

4    **F.  Common Law Fraud, Fraudulent Concealment, Constructive Fraud, and**

5    **WCPA claims**

6    **1.  Particularity**

7    Plaintiffs bring claims of common law fraud, fraudulent concealment, and constructive

8    fraud against defendants.  Defendants argue that these claims must be dismissed because they do

9    not meet Fed. R. Civ. P. 9(b)'s heightened requirements for pleading allegations sounding in

10   fraud.  *See* Dkt. 30, at 15.  They argue that the same outcome also applies to plaintiffs' WCPA

11   claims, which sound in fraud.  Dkt. 30, at 18.

12   Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances

13   constituting fraud."  Fed. R. Civ. P. 9(b).  "Rule 9(b)'s particularity requirement applies to state-

14   law causes of action" alleged in federal court.  *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097,

15   1103 (9th Cir. 2003). An allegation of fraud is sufficient under Rule 9(b) if it "identifies the

16   circumstances constituting fraud so that the defendant can prepare an adequate answer from the

17   allegations."  *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) (internal citations and

18   quotations omitted).  Put another way, plaintiffs must "state the time [and] place . . . of the false

19   representations as well as the identities of the parties to the misrepresentation."  *Schreiber*

20   *Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

21   At the outset, plaintiffs cite *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245

22   F.3d 1048, 1052 (9th Cir. 2001), in the operative complaint as support that they are entitled to a

23   lenient application of Rule 9(b) because the information supporting their claims is in defendants'

24

possession.  *E.g.*, Dkt. 29, at 54.  But that rule would apply in corporate fraud cases where "the evidence is within a defendant's exclusive possession" (*id.*)—here, there is no allegation plausibly supporting that all relevant evidence is in defendants' exclusive possession.  Indeed, plaintiffs also allege that the evidence has already "been introduced in several pelvic mesh trials against Defendants" and that there has already been "substantial general discovery[.]"  Dkt. 29, at 54.

Nevertheless, the Court finds that plaintiffs have adequately pleaded their fraud-based claims so that defendants can prepare an adequate answer from the allegations.  A review of plaintiffs' fraud-related claims demonstrates that their claims primarily sound in the omission of information about the danger of the implant products that was known to defendants.  *E.g.*, Dkt. 29, at 59 ("Despite what was known or knowable to Defendants about the lack of safety and efficacy of their TVT-S and Prosima pelvic mesh products throughout the relevant time periods, Defendants failed to disclose this information. . . .").

"Clearly, a plaintiff in a fraud by omission suit will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim."  *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1098–99 (N.D. Cal. 2007); *see also Asghari v. Volkswagon Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1325 (C.D. Cal. 2013) (Where "a claim rests on allegations of fraudulent omission, . . . the Rule 9(b) standard is somewhat relaxed because a plaintiff cannot plead either the specific time of omission or the place, as [the plaintiff] is not alleging an act, but a failure to act.").

The Court disagrees with defendants that allegations of "fail[ure] to disclose" are too "flimsy" to suffice, on their face.  *See* Dkt. 30, at 16.  Defendants assert a lack of allegations about "the details of the Defendants' allegedly fraudulent acts, when they occurred, and who

engaged in them[.]" Dkt. 34, at 8.  But plaintiffs have alleged that defendants had a duty to

accurately inform the public about the lack of testing of the products (Dkt. 29, at 33–34) and the

products' known issues (Dkt. 29, at 45, 54, 60), yet continuously breached this duty.  *See* Dkt.

29, at 34, 45.  They allege that defendants were aware of issues with predicate devices to these

products and that from the time of seeking FDA approval, defendants knew that, in fact,

"significant differences exist and existed between the [] products and their predecessor . . .

products, such that the disclosures to the FDA were and are incomplete and misleading[.]"  Dkt.

29, at 16–17.  They allege that defendants have continuously known that "scientific evidence

shows that this mesh material is biologically incompatible with human tissue and promotes an

immune response in a large subset of the population[.]"  Dkt. 29, at 7–8.  And, as already noted,

they allege a detailed list of alleged defects with the products that should have been disclosed.  In

light of the authority above, the Court finds that plaintiffs have adequately pleaded their claims

sounding in fraud by omission to meet Rule 9(b).  Similarly, the WCPA claims, which refer to

plaintiffs' fraud allegations and the same allegations of knowing concealment of material

information about the products' safety, should not be dismissed for failure to allege fraud with

particularity.

 The Court turns to defendants' more particular arguments regarding fraudulent

concealment and constructive fraud.

### 2. Fraudulent Concealment

 Defendants argue that the claim for fraudulent concealment fails because a cognizable

claim of fraudulent concealment requires allegations of some form of special relationship that

justifies imposing a duty to disclose.  *See* Dkt. 30, at 17.  For their part, plaintiffs allege that they

had a special relationship with defendants because defendants sold the products "directly or

1    indirectly" to plaintiffs to be implanted in plaintiffs, so that defendants had a duty to disclose.

2    Dkt. 29, at 59.  The Court agrees with defendants that plaintiffs have failed to plausibly plead

3    this claim.

4          "Washington law follows the Restatement rule that imposes liability when one fails to

5    reveal material facts within one's knowledge, if there is a duty to speak."  16A Wash. Prac., Tort

6    Law And Practice § 19:7 (5th ed.).  "If there is a special relationship between the parties, such

7    that the law imposes an affirmative duty to disclose material information, silence may be

8    sufficient to establish fraudulent concealment."  *Giraud v. Quincy Farm & Chem.*, 102 Wn. App.

9    443, 453 (2000); *see also Colonial Imps., Inc. v. Carlton N.W., Inc.*, 121 Wn.2d 726, 732 (1993)

10   (A fiduciary relationship is not essential, but some kind of "special relationship" must exist

11   before the duty will arise).

12         In support of their fraudulent concealment claim, plaintiffs assert that they have alleged

13   facts amounting to either a "quasi-fiduciary relationship" or a "confidential relationship."

14   "Washington courts have found the existence of a quasi-fiduciary relationship where a special

15   relationship of trust and confidence has been developed between the parties; where one party is

16   relying upon the superior specialized knowledge and experience of the other party, where a seller

17   has knowledge of a material fact not easily discoverable by the buyer, and where there exists a

18   statutory duty to disclose."  16A Wash. Prac., Tort Law And Practice § 19:7 (5th ed.) (citations

19   omitted).  "A confidential relation exists between two persons when one has gained the

20   confidence of the other and purports to act or advise with the other's interest in mind."  *Kitsap*

21   *Bank v. Denley*, 177 Wn. App. 559, 572 (2013) (internal citations and quotation marks omitted).

22         Here, the basis specified by plaintiffs for the existence of a quasi-fiduciary or confidential

23   relationship ("Defendants sold these . . . devices—directly or indirectly—to Plaintiffs for the

1  express purpose of having these products implanted in Plaintiffs" (Dkt. 32, at 16)) is not one of

2  the enumerated ways in which a quasi-fiduciary relationship or confidential relationship arises

3  under Washington law.  The Court observes that plaintiffs allege that defendants were in a

4  superior position to know the facts concealed from them, but that does not necessarily mean that

5  they were in a "quasi-fiduciary relationship or confidential relationship" with plaintiffs.  This

6  needs further explanation.

7         Therefore, the fraudulent concealment claim should be dismissed.  Amendment would

8  not be futile, so that the District Court should grant leave to amend this claim.

9                                  **3.  Constructive Fraud**

10        "Conduct that is not actually fraudulent but has all the actual consequences and legal

11  effects of actual fraud is constructive fraud."  *Green v. McAllister*, 103 Wn. App. 452, 467

12  (2000), *superseded by statute on other grounds as recognized in McLelland v. Paxton*, 11 Wn.

13  App. 2d 181, 221–22 (2019).  The *Green* court defined constructive fraud "as failure to perform

14  an obligation, not by an honest mistake, but by some 'interested or sinister motive.'"  *Id.* at 468

15  (quoting *In re Estate of Marks*, 91 Wn. App. 325, 336 (1998)).  "Washington law is not well

16  developed as to the claim of constructive fraud, but courts appear to agree that a plaintiff must

17  allege (1) an interested or sinister motive and (2) a fiduciary or quasi-fiduciary relationship

18  between the parties."  *Singleton v. Nationwide Ins. Co. of Am.*, No. C20-5688 BHS, 2020 WL

19  6287124, at *2 (W.D. Wash. Oct. 27, 2020) (citing authorities).

20        As noted above, plaintiffs have not plausibly alleged the existence of a quasi-fiduciary

21  relationship between the parties.  Plaintiffs assert that they have plausibly alleged that they were

22  third-party beneficiaries, but the Court disagrees for the reasons set forth above.  Moreover,

23  plaintiffs have not provided the Court with any authority that status as a third-party beneficiary

24

1    satisfies the requirements of a special relationship as necessary to allege a claim of constructive

2    fraud or fraudulent inducement.  Thus, the constructive fraud claim should be dismissed.

3    Because amendment would not be futile, the dismissal should be with leave to amend.

4        In summary, defendants have failed to show that the common law fraud and WCPA

5    claims should be dismissed.  However, the constructive fraud and fraudulent inducement claims

6    should be dismissed with leave to amend.

7                    **G.  Unjust Enrichment**

8        Plaintiffs allege that defendants were unjustly enriched by receiving a financial benefit

9    for products that did not safely and effectively treat plaintiffs' medical conditions.  Dkt. 29, at

10   71.  Defendants assert that plaintiffs cannot recover for unjust enrichment where the WPLA

11   provides for recovery.  *See* Dkt. 30, at 20.

12       Defendants are correct that generally, a plaintiff cannot prevail on both product defect-

13   based claims for unjust enrichment in complaint and claims under the WPLA.  *E.g.*, *Hoefs v. Sig*

14   *Sauer Inc.*, No. 3:20-CV-05173-RBL, 2020 WL 3488155, at *2 (W.D. Wash. June 26, 2020)

15   ("[Plaintiff's] claims for . . . unjust enrichment . . . are preempted by the WPLA."); *see also*

16   *Blangeres v. U.S. Seamless, Inc.*, 725 F. App'x 511, 514 (9th Cir. 2018).  This is because a

17   portion of the WPLA, RCW 7.72.010(4), operates to preempt common law remedies other than

18   "fraud, intentionally caused harm or a claim or action under the consumer protection act, chapter

19   19.86 RCW."  *See Louisiana-Pac. Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1584 (9th Cir. 1994), *as*

20   *amended* (Aug. 30, 1994); *see also Wash. Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d

21   847, 867, *amended by* 779 P.2d 697 (Wash. 1989) (holding that the WPLA "preempts" common

22   law remedies).

23

24

Plaintiffs do not offer any Washington State authority supporting that their unjust enrichment claim survives. Nor is the Court aware of any that is directly on point. The unjust enrichment claim should be dismissed without leave to amend, since amendment would be futile.

### H.  Loss of Consortium

Plaintiffs allege that Ms. Hosking's spouse has suffered a loss of consortium. Dkt. 29, at 72. Defendants argue that this claim is not supported by plausible factual allegations particular to Ms. Hosking's spouse. The Court disagrees with defendants.

Loss of consortium is typically thought of as a "loss of society, affection, assistance and conjugal fellowship, and . . . loss or impairment of sexual relations" in the marital relationship. *Ueland v. Pengo Hydra-Pull Corp.*, 103 Wn.2d 131, 132 n.1 (1984) (citing *Black's Law Dictionary* 280 (5th ed. 1979)).

Defendants cite to an unpublished case from another District finding that an allegation that amounted to no more than a statement that the spouse was married to the injured plaintiff was inadequate to make out a claim for loss of consortium. Dkt. 29, at 20. The Court is not compelled to recommend dismissal on the basis of this nonbinding authority.

Here, plaintiffs have alleged, among other things, that Ms. Hosking has suffered a loss of his spouse's support, companionship, and society, and the factual allegations supporting this claim are, in the context of the injury to Ms. Hosking that is alleged, readily apparent. Therefore, the loss of consortium claim should not be dismissed.

### CONCLUSION

For the reasons set forth above, the Court recommends that the motion to dismiss (Dkt. 30) be granted in part and denied in part. The claim for unjust enrichment should be dismissed without leave to amend. The claims for constructive fraud, fraudulent inducement, and breach of

the implied warranty of merchantability should be dismissed with leave to amend.  Plaintiffs should be granted until 30 days from the date of the District Court's order on this report and recommendation to file an amended complaint, which may only amend the claims dismissed with leave to amend.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **July 30, 2021,** as noted in the caption.

Dated this 12th day of July, 2021.

J. Richard Creatura
Chief United States Magistrate Judge